### UNITED STATES v. STANFORD.

(Circuit Court of Appeals, Ninth Circuit. October 12, 1895.)

No. 246.

PACIFIC RAILROADS— LIABILITY OF STOCKHOLDERS — WAIVER — CONGRESSIONAL LEGISLATION.

By the act of July 1, 1862, congress, for the purpose of securing the construction of a railroad and telegraph line across the continent, to unite the Eastern and Western states, and to develop the territories, created a corporation, the U. P. R. Co., and authorized it to construct a railroad and telegraph line from a point 100 miles west of the Missouri river to the boundary of California, with a branch line from the Missouri river to the

starting point. In aid of the construction of the road, public lands were granted to the corporation, and it was provided that, on the completion of each section of the road, bonds of the United States should be delivered to the corporation, the repayment of which was secured by making such bonds a first lien on the road. The act also authorized the K. R. Co., a Kansas corporation, to build a connecting road from a point in Kansas; and a subsequent amendatory act authorized such K. R. Co., if the U. P. R. Co. was not proceeding in good faith with the construction of its main line, to undertake and complete such line. Sundry other railroad companies were authorized by the act to build connecting lines, forming parts of a system by which the eastern end of the transcontinental line was to be connected with centers of population and trade. The act also authorized the C. P. R. Co., a California corporation, to build a road from the Pacific coast to the boundary of California, to connect with the U. P. Co.'s line, on the same terms and conditions as were granted to that company. The constitution and laws of California under which the C. P. Co. was organized provided that its stockholders should be individually liable for its debts. The stockholders of the U. P. Co. were not made liable for its debts, nor were the stockholders of the K. R. Co. liable for its debts. The act of July 1, 1862, also provided that either the K. R. Co. or the C. P. Co., after completing its own line, might unite on equal terms with the U. P. Co. in constructing the remainder of its line, and that, if the U. P. Co. reached the boundary of California before the C. P. Co., it might continue building the road through California to a meeting point, or, if the C. P. Co. first reached the boundary, it might continue building, across the territories, to a meeting with the U. P. Co. It also provided that any or all of the railroad companies named in it might consolidate into one company, and proceed to construct the road on the terms named in the act. By the amendatory act of July 2, 1864, congress increased the grant of land to the roads, removed certain restrictions on the use of the bonds, permitted the making by the companies of mortgages which should be a lien superior to the bonds, granted powers of eminent domain, and provided particularly for the consolidation of companies named in the acts; such consolidated company to possess all the grants, benefits, etc., of the constituent companies, and to have the right to complete any unfinished portion of the road of any company named in the act. The W. P. R. Co. was incorporated in California in December, 1862, and, by assignment from the C. P. Co., was authorized to build a part of the road contemplated by the acts of congress. By an act of March 3, 1865, congress ratified such assignment, and authorized the W. P. Co. to issue its bonds in like manner as the other companies. The C. P. Co. and the W. P. Co. were afterwards consolidated. The several acts of congress were accepted by the various companies, and the bonds issued to them, and the interest and parts of the principal as it matured paid by the United States. The C. P. Co. became insolvent, without paying or making provision for its liability to the United States upon the bonds issued to it. *Held*, that the terms of the various acts of congress, constituting the contract of the United States with the companies, and the course of dealing of congress with the companies, in view of the circumstances and of the purpose of congress in enacting the legislation, amounted to a waiver of the individual liability of the stockholders of the California corporations, and that such stockholders could not be held liable to the United States for the bonds advanced to such corporations.

Appeal from the Circuit Court of the United States for the Northern District of California.

This was a suit by the United States against Jane L. Stanford, as executrix of the will of Leland Stanford, deceased, to establish a liability of the estate of the decedent as a stockholder in the Central Pacific Railroad Company. The defendant demurred to the bill. The circuit court sustained the demurrer. 69 Fed. 25. Complainant appeals. Affirmed.

L. D. McKisick, for the United States.

John Garber, for appellee.

Before GILBERT, Circuit Judge, and HAWLEY and MORROW, District Judges.

GILBERT, Circuit Judge. On the 15th day of March, 1895, the United States filed a bill in equity in the circuit court of the United States for the Northern district of California to establish a claim for $15,237,000 against the estate of Leland Stanford, deceased. The bill alleges, in substance, that the Central Pacific Railroad Company of California was organized on the 28th day of June, 1861, under and by virtue of an act of the legislature of the state of California approved May 20, 1861; that the Western Pacific Railroad Company was a corporation existing under the laws of California, organized under the same act; that under the Pacific railroad acts of congress of July 1, 1862, July 2, 1864, and other subsequent acts, the said two California corporations made and entered into a contract with the United States, whereby they became indebted to the United States, on account of the bonds of the United States loaned to the said corporations under and by virtue of the terms of said acts, the sum whereof at the maturity of the bonds will amount to about $78,-000,000, including principal and interest; that after said contracts were entered into, and said bonds were loaned to the two corporations named, they were consolidated and amalgamated into what is known as the Central Pacific Railroad Company; that the said company is now insolvent, and, after deducting all credits to which it and the estate of Leland Stanford are or hereafter may become entitled, the Central Pacific Railroad Company will still be indebted to the United States in the sum of more than $60,000,000, for which the United States have no security, and that the whole of said debt will be lost, unless the same can be collected from the stockholders of said corporation, under the provisions of the constitution and the laws of the state of California; that Leland Stanford was a stockholder in the Central Pacific Railroad Company of California from the date of its organization and during all the times at which the United States loaned and delivered the said bonds to that corporation, and that on and after the 8th day of June, 1867, he was a stockholder in the Western Pacific Railroad Company, and was and remained a stockholder in the said amalgamated corporation from the date of such consolidation until his death, and that as such stockholder he was, at the time of his death, liable for his proportion of the debt so due and owing to the United States, and that his estate is now liable therefor; that the United States have paid all the interest which has accrued on said bonds, and will continue to do so until the maturity of the last thereof; that on the 16th day of January, 1895, $2,362,000 principal of said bonds matured and became payable, and on that day the same were paid by the United States. The defendant demurred to the bill for want of equity. The circuit court sustained the demurrer, and thereafter entered a decree dismissing the bill. 69 Fed. 25. From the decree so entered this appeal is taken.

The constitution of the state of California, adopted in the year 1849, and which was in force at the time of the organization of the Central Pacific Railroad Company of California and the Western Pacific Railroad Company, and at the time when the United States entered into contract relations with said corporations, and during the period within which the bonds were earned under the terms of the act and were received by the railroad companies, contained in article 4 the following provisions concerning the individual liability of stockholders of corporations for the payment of the debts thereof:

"Sec. 31. Corporations may be formed under general laws, but shall not be created by special act, except for municipal purposes. All general laws and special acts passed pursuant to this section may be altered, from time to time, or repealed.

"Sec. 32. Dues from corporations shall be secured by such individual liability of the corporators, and other means, as may be prescribed by law."

"Sec. 36. Each stockholder of a corporation or joint stock association shall be individually and personally liable for his proportion of all its debts and liabilities."

The first act of congress creating the contract relations under which the present suit is brought is entitled "An act to aid in the construction of a railroad and telegraph line from the Missouri river to the Pacific Ocean, and to secure to the government the use of the same for postal, military, and other purposes," enacted July 1, 1862 (12 Stat. 489). It begins by creating a body corporate under the name of the Union Pacific Railroad Company, consisting of 158 citizens, named, taken from nearly all the states then loyal to the Union, together with five commissioners to be named by the secretary of the interior, and empowers the company to lay out and maintain a continuous railroad and telegraph line from a point on the 100th meridian of longitude west from Greenwich, between the south margin of the valley of the Republican river and the north margin of the valley of the Platte river, in the territory of Nebraska, to the western boundary of Nevada territory. The point of departure fixed at the 100th meridian of longitude was about 200 miles west of the Missouri river. But the same act made provision for the construction of branch roads and telegraph lines from several points on the Missouri river, to connect with the main line of the Union Pacific Railroad Company at the 100th meridian of longitude. These points on the Missouri river were either mentioned in the act or subsequently designated as Sioux City and Council Bluffs in Iowa, Atchison and Leavenworth in Kansas, and Kansas City in Missouri. The Union Pacific Company was also authorized, by section 14 of the act, to build a line of road and telegraph from the western boundary of the state of Iowa (a point subsequently designated as Council Bluffs), upon the most direct and practicable route, to the 100th meridian of longitude, so as to connect with the main line at that point. This section of road and telegraph was intended as a direct connection with any railroad that might thereafter be constructed through the state of Iowa, with a terminus at Council Bluffs. None was then completed, but a railroad was in progress of construction through the state from the eastern border to the Missouri river. It was also provided in section 14 of the act that whenever there should be a

line of railroad completed through Minnesota or Iowa to Sioux City, then the said Pacific Railroad Company was authorized and required to construct a railroad and telegraph line from said Sioux City, upon the most direct and practicable route, so as to connect with the Iowa branch of or with the main line of the Union Pacific Railroad not further west than the 100th meridian of longitude. The act vested the Union Pacific Railroad Company with all the powers, privileges, and immunities necessary to carry into effect the purposes of the act. It conferred upon the corporation the right of way through the public lands, and granted to it, for the purpose of aiding in the construction of the railroad and telegraph line, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores thereon, every alternate section of public land, to the amount of five sections per mile on each side of the said road; and provided that whenever the company shall have completed 40 consecutive miles of any portion of said railroad and telegraph line, to the approval of the commissioners appointed by the president to examine the same, patents shall issue therefor to the lands so granted, and bonds of the United States shall issue to said railroad company, of $1,000 each, payable in 30 years after date, bearing 6 per centum interest, to the amount of 16 of said bonds per mile for such section of 40 miles; and that to secure the repayment to the United States of the amount of said bonds, together with interest thereon, the issue and delivery of said bonds shall ipso facto constitute a first mortgage on the whole line of the road and telegraph line and rolling stock and fixtures of the road; and that upon the failure of the company to redeem said bonds, or any part thereof, when required so to do in accordance with the provisions of the act, the said road, with all rights, functions, immunities, and appurtenances, and all lands granted to the same, then belonging to the company, might be taken possession of for the use and benefit of the United States. It further provided that the grants so enumerated were made upon condition that said company should pay such bonds at maturity, and should keep said railroad and telegraph line in repair and use, and should at all times transmit dispatches over said telegraph line, and transport mails, troops, and munitions of war, etc., upon said railroad for the government whenever required to do so; and that said company might pay the United States, wholly or in part, in said bonds so granted, or treasury notes, or other evidences of debt against the United States, to be allowed at par; and that, after said road should be completed, and until said bonds were paid, at least 5 per centum of the net earnings of said road should be annually applied to the payment thereof. The act also gave authority to the Leavenworth, Pawnee & Western Railroad Company of Kansas (afterwards known as the Kansas Pacific) to construct a railroad and telegraph line from the Missouri river, at the mouth of the Kansas river, to the aforesaid point, on the 100th meridian of longitude west from Greenwich, upon the same terms and conditions in all respects as are provided in the act for the construction of the Union Pacific Railroad, and to meet and connect with the same at the meridian of longitude aforesaid; and that, in case the general route of the line of road from the

Missouri river to the Rocky Mountains should be so located as to require a departure northwardly from the proposed line of said Kansas road before it reaches the meridian of longitude aforesaid, the location of said Kansas road shall be made so as to conform thereto; the route in Kansas, west of the meridian of Ft. Riley, to be subject to the approval of the president of the United States. By section 12 of the amendatory act of July 2, 1864, the Leavenworth, Pawnee & Western Railroad Company (then known as the Union Pacific Railroad Company, Eastern Division, and afterwards as the Kansas Pacific) was required to build a railroad from the mouth of the Kansas river, by way of Leavenworth, or, if that were not deemed the best route, then the said company should, within two years, build a railroad from the city of Leavenworth to unite with the main stem at or near the city of Lawrence, Kan. It was further provided by this section that, if the Union Pacific Railroad Company should not be proceeding in good faith to build its road through the territories when the Kansas Pacific should have completed its road to the 100th degree of longitude, then said last-named company might proceed to build its road westward until it met and connected with the Central Pacific Railroad on the same line, the railroad from the mouth of the Kansas river to the 100th meridian of longitude to be made by way of Lawrence and Topeka, or on the bank of the Kansas river opposite said towns. By the thirteenth section of the act of July 1, 1862, the Hannibal & St. Joseph Company of Missouri was authorized to extend its road from St. Joseph, in Missouri, via Atchison, in Kansas, so as to connect with the Leavenworth, Pawnee & Western Railroad through Kansas, or with the Union Pacific, from the western boundary of Iowa. By means of these several branches from different points on the Missouri river, converging at the 100th meridian of longitude, the main line across the continent was to be brought into direct communication with lines of interstate traffic in the direction of important trade centers and the populous sections of the Eastern coast. The Union Pacific Railroad Company, as we have seen, was authorized to construct a railroad and telegraph line from the Missouri river to the 100th meridian, and from this point of departure to construct the main line to the western boundary of Nevada territory, but the purpose of the act of July 1, 1862, as expressed in its title, was "the construction of a continuous line of railroad and telegraph from the Missouri river to the Pacific coast." The scheme, therefore, involved a further provision for the western terminus of the road on the Pacific coast. The ninth section provided as follows:

"The Central Pacific Railroad Company of California, a corporation existing under the laws of the state of California, are hereby authorized to construct a railroad and telegraph line from the Pacific coast, at or near San Francisco, or the navigable waters of the Sacramento river, to the eastern boundary of California, upon the same terms and conditions, in all respects, as are contained in this act for the construction of said railroad and telegraph line first mentioned, and to meet and connect with the first mentioned railroad and telegraph line on the eastern boundary of California. Each of said companies shall file their acceptance of the conditions of this act in the department of the interior within six months after the passage of this act."

The tenth section provided that the said company chartered under the laws of Kansas and the said company chartered under the laws of California, or either thereof, may, after completing their roads respectively, unite upon equal terms with the first-named company (to wit, the Union Pacific Railroad Company) in constructing so much of said railroad and telegraph line and branch railroads and telegraph lines as were in the act mentioned, "through the territories from the state of California to the Missouri river, as shall then remain to be constructed, on the same terms and conditions as provided in this act in relation to the said Union Pacific Railroad Company." The tenth section further provides that the Hannibal & St. Joseph Railroad, the Pacific Railroad Company of Missouri, and the Union Pacific Company, or either of them, on filing their assent to this act, may unite upon equal terms, under this act, with the said Kansas Company, in constructing said railroad and telegraph to said meridian of longitude, with the consent of the state of Kansas; and that, in case the Union Pacific Company should complete its line to the eastern boundary of California before it is completed across the state of California by the Central Pacific Railroad Company of California, it might continue in constructing the same through California, with the consent of that state, upon the terms mentioned in the act, until said roads should meet and connect, and the whole line of said railroad and telegraph should be completed. "And the Central Pacific Railroad Company of California, after completing its road across said state, is authorized to continue the construction of said railroad and telegraph through the territories of the United States to the Missouri river, including the branch roads specified in this act, upon the routes hereinbefore and hereinafter indicated, on the terms and conditions provided in this act in relation to the said Union Pacific Railroad Company, until said roads shall meet and connect, and the whole line of said railroad and branches and telegraph is completed." The act contains further provision for special aid by additional bonds in constructing the road through mountainous and difficult regions of country, for a uniform track upon the entire line of railroad and branches, the width to be determined by the president of the United States, for prescribed and limited grades and curves of the roadbed, and provides that, so far as concerns the government, the whole line of said railroad and branches and telegraph shall be operated and used for all purposes of communication, travel, and transportation as one connected, continuous line. It provides also that the Missouri and Kansas and California corporations assenting to the provisions of the act shall receive and transport all materials required for constructing and furnishing the Union Pacific line, at cost, over the portions of the roads to be constructed by said companies under the act. There are other provisions concerning the extension of the roads so mentioned, and the connection thereof with the other lines named in the act. In section 15 there is the general provision:

"That any other railroad company now incorporated, or hereafter to be incorporated, shall have the right to connect their road with the road and branches provided for by this act, at such places and upon such just and equitable terms as the president of the United States may prescribe."

Section 16 provides:

"That at any time after the passage of this act all of the railroad companies named herein, and assenting hereto, or any two or more of them, are authorized to form themselves into one consolidated company; notice of such consolidation, in writing, shall be filed in the department of the interior, and such consolidated company shall thereafter proceed to construct said railroad and branches and telegraph line upon the terms and conditions provided in this act."

The seventeenth section provides, in substance, that in case any of the companies so named shall fail to comply with the terms of the act by not completing said road and telegraph and branches within a reasonable time, or by not keeping the same in repair, congress may pass an act to insure the speedy completion thereof, or put the same in repair, and may direct the income thereof to be thereafter devoted to the use of the United States, to repay all expenditures caused by such default or neglect; and that, in case said roads are not completed so as to form a continuous line of railroad from the Missouri river to the navigable waters of the Sacramento river, in California, by July 1, 1876, the whole of said railroads, together with all their furniture, fixtures, rolling stock, etc., shall be forfeited to and be taken possession of by the United States; and the United States reserves unto itself the possession of 25 per centum of the bonds granted to aid said roads along certain parts of said roads, and 15 per centum of bonds upon other portions thereof, until the road should be completed as required by the act. In the eighteenth section it was enacted that "congress may, at any time, having due regard for the rights of said companies named herein, add to, alter, amend, or repeal this act."

On July 2, 1864, congress amended the act of 1862. 13 Stat. 356. It conferred upon the corporations named in that act the power of eminent domain, and prescribed the method of its exercise, doubled the grant of lands to aid the construction of the road, repealed the requirement that a portion of the bonds should be reserved as security for the completion of the road, and provided that the aided companies might each issue their own first mortgage bonds on their respective railroad and telegraph lines. to an amount not exceeding the amount of the bonds of the United States, and that the lien of the United States bonds should be subordinate to that of the bonds so issued by the companies. It defined with great particularity and detail the method of consolidation of the corporations. It provided, substantially, that any two or more of the companies authorized to participate in the benefits of the acts were empowered at any time to unite and consolidate, upon such terms and conditions and in such manner as they might agree upon, not incompatible with the act, or the laws of the state or states in which the roads of such companies might be, and to assume and adopt such corporate name and style as they might agree upon, with capital stock not to exceed the actual cost of the roads so consolidated; and that, upon filing a copy of such consolidation in the department of the interior, such organization would "succeed to, possess, and be entitled to receive from the United States, all and singular the grants, benefits, immunities,

guarantees, acts, and things to be done and performed, and be subject to the same terms, conditions, restrictions, and requirements which said companies respectively, at the time of such consolidation, are, or may be entitled to under this act, in place and substitution of said companies so consolidated respectively"; and that all other provisions of the act, as far as applicable, were to apply to such consolidated organization. It was further provided that if, upon the completion of such consolidated organization of the roads, or either of them, of the companies so consolidated, any other of the road or roads of either of the other companies authorized as aforesaid (and forming, or intended or necessary to form, a portion of a continuous line from each of the several points on the Missouri river to the Pacific coast) should not have constructed the number of miles of its said road within the time required, such consolidated organization might continue the construction of its road and telegraph in the direction and route upon which such incomplete or unconstructed road was authorized to be built, until the continuation of the road of such consolidated organization should reach the constructed road and telegraph of the other company, and at such point to connect and unite therewith, etc. It was further provided that such consolidated company should pay to any defaulting company the value, to be estimated by competent engineers, of all the work done and material furnished by such defaulting company, which might be adopted and used by said consolidated company in the progress of the work, subject to the further provision, however, that the defaulting company might, at any time before receiving pay for its work and material, on its own election, pay the consolidated company the value of the work done and material furnished by the consolidated company, to be estimated, etc., and resume the control of its road. The same privilege of extending its road after completing that part which it was required to build was extended to the individual companies under the same circumstances as provided for the consolidated company. In case there should be more than one consolidated company, the same terms and conditions should apply to both.

The Central Pacific Railroad Company of California filed its acceptance of the terms of the first act upon January 1, 1863. On the 8th day of October it increased its capital stock to $20,000,000, and on July 15, 1868, increased the same to $100,000,000. The bonds of the United States were issued, payable 30 years from date of issue, and were received by the companies at various dates from January 6, 1865, to December 31, 1869. The Western Pacific Railroad Company of California was incorporated under the laws of that state on the 11th day of December, 1862, for the purpose of building a railroad and telegraph line from the city of San José to the city of Sacramento. It is alleged in the bill that this road "was intended to be, and in fact was, a part of the road which congress authorized and desired should be constructed from the Missouri river to the Pacific Ocean under the act of July 1, 1862, and the acts amendatory thereof." By an assignment from the Central Pacific Railroad Company of California to the Western Pacific Railroad Company, made October 31, 1864, the Western Pacific Railroad Company was author-

ized to build that portion of the railroad and telegraph line. This railroad and telegraph line was intended to connect at San José with the San Francisco & San José Railroad Company, and at Sacramento with the Central Pacific Railroad Company. On March 3, 1865, congress so amended the prior acts as to allow the Western Pacific Railroad Company of California to issue its bonds in the same manner as was provided for the other companies, and enacted that the assignment made by the Central Pacific Railroad Company of California to the Western Pacific Railroad Company of the right to construct all that portion of said railroad and telegraph line from the city of San José to the city of Sacramento be ratified and confirmed to the said Western Pacific Railroad Company, "with all the privileges and benefits of the several acts of congress relating thereto, and subject to all the conditions thereof." On the 22d day of June, 1870, the Central Pacific Railroad Company of California and the Western Pacific Railroad Company amalgamated, and consolidated the two corporations into one company under the name of the Central Pacific Railroad Company. On May 7, 1878, congress enacted the sinking fund act, in which it was affirmed that "said Western Pacific Railroad Company has become merged in and consolidated with said Central Pacific Railroad Company, under the name of the Central Pacific Railroad Company, whereby the said Central Pacific Railroad Company has become liable to all the burdens, duties and obligations before resting upon said Western Pacific Railroad Company." The act further provides for a sinking fund, to be created out of one-half the compensation for services which might be rendered to the government by the Central Pacific Railroad Company and the Union Pacific Railroad Company; the other half of such compensation to be applied in liquidation of the interest on the subsidy bonds.

Upon these statutes, so constituting the contract relation between the United States and the Central Pacific Railroad Company, the question arises whether or not it was the intention of the United States to hold the stockholders of that corporation individually liable for the default of the railroad company in case of its failure to pay its debt to the United States when due, and whether or not the provisions of those statutes, and the course of dealing of the United States with the corporations therein mentioned, were such as to justify the stockholders of the Central Pacific Railroad Company in believing, at the time they became stockholders in said company, or in either of the companies subsequently consolidated therein, and at the time the debt to the government was incurred, that they were as free from individual liability for such debt as were the stockholders of the Union Pacific Railroad Company, or the stockholders of the other corporations which were aided in like manner. Upon the one hand, it is urged that, while the Union Pacific Railroad Company received its corporate franchises from the United States, and was therefore to some extent under the control of the government, which was its sovereign, the Central Pacific Railroad Company received none of its corporate privileges or immunities from the United States, but took its life and attributes from the state of California, and that the rights and privileges which it acquired from the government

were taken by contract, and not otherwise; and that when its rep-
resentatives went from the state of California to congress, and there
asked aid from the government to construct its road, it sent with
said representatives and submitted to congress the provisions of its
charter from the state of its creation, a portion of which charter was
the constitutional provision of the state, declaring that stockholders
should be individually liable for all the debts of the corporation; and
that it must be presumed that in entering into contract relations
with a corporation of which it was not the sovereign the United
States must have had regard to the laws of the state under which
the corporation was organized, and under which it might eventually
be required to enforce its demands; and that, notwithstanding it
appears from the acts of congress that no reference was therein ex-
pressly made to such ultimate liability of stockholders, the omission
is unimportant; and that the rights of the government in the present
suit are not to be determined by what was thought of or omitted
at the time the contract was entered into, but by reference to the
remedies afforded it by law to enforce its demands in a forum in the
state where the corporation was created.

In order to understand the relation of the United States to the
corporations that entered into this agreement in the year 1862, it is
necessary to refer to the condition of the country, the situation of
the territory to be affected by the improvement, and the purposes
that the United States had in view in fostering the enterprises con-
templated in the act.   Those purposes have heretofore been advert-
ed to and considered by the supreme court in cases of litigation be-
tween the bond-aided corporations and the United States, and it will
be sufficient for the purposes of this opinion to quote from the ex-
pressions of the views of that court.   Said Mr. Justice Davis, in U.
S. v. Union Pac. R. Co., 91 U. S. 79, 81, 89:

"The bonds in question were issued in pursuance of a scheme to aid in the
construction of a great national highway. * * * The war of the Rebellion
was in progress; and, owing to complications with England, the country had
become alarmed for the safety of our Pacific possessions. The loss of them
was feared in case those complications should result in an open rupture; but,
even if this fear were groundless, it was quite apparent that we were unable to
furnish that degree of protection to the people occupying them which every
government owes to its citizens. It is true, the threatened danger was hap-
pily averted; but wisdom pointed out the necessity of making suitable pro-
vision for the future. This could be done in no better way than by the con-
struction of a railroad across the continent. * * * But the primary object
of the government was to advance its own interests, and it endeavored to
engage individual co-operation as a means to an end,—the securing a road
which could be used for its own purposes. The obligations, therefore, which
were imposed on the company incorporated to build it, must depend on the
true meaning of the enactment itself, viewed in the light of contemporaneous
history. * * * Of necessity, there were risks to be taken in aiding with
money or bonds an enterprise unparalleled 'in the history of any free people,
the completion of which, if practicable at all, would require, as was supposed,
twelve years. But these risks were common to both parties. Congress was
obliged to assume its share, and advance the bonds, or abandon the enter-
prise; for clearly the grant of lands, however valuable after the road was
finished, could not be available as a resource for building it. If the road were
a success, in addition to the benefits it would confer on the United States the
corporation would be in a situation to repay the advances for interest, and
the principal when due. If, on the contrary, it proved to be a failure, sub-

jecting the private persons who invested their capital in it to a total loss, there would be left the entire property of the corporation, of which immediate possession could be taken by the government on a declaration of forfeiture."

In U. S. v. Union Pac. R. Co., 98 U. S. 614, Mr. Justice Miller said:

"But in its anxiety to secure the rapid prosecution of the work—an end more important to it than to any one else, and still more important to the people, whom it represented—it postponed this lien to another mortgage, that the means might be raised to complete the road."

In the Sinking Fund Cases, 99 U. S. 723, Mr. Chief Justice Waite said:

"Great undertakings like this, whose future is at the time uncertain, requiring, as they do, large amounts of money to carry them on, seem to make it necessary that extraordinary inducements should be held out to capitalists to enter upon them, since a failure is almost sure to involve those who make the venture in financial ruin."

Aside from the scope of the internal improvements which were contemplated, and the emergency which impelled their inception, there is much in the language of the acts to indicate that in treating with the Central Pacific, as well as the other railroad companies mentioned in the contracts, the United States was pursuing a general scheme of internal improvement, and in so doing was dealing with all the aided companies upon terms of liberality and equality. No discrimination is made in favor of either the corporation created by act of congress or the corporations existing under the laws of the states which were the beneficiaries of the act. In incorporating the Union Pacific Railroad Company, congress was silent upon the subject of the individual liability of its stockholders. Those stockholders, therefore, cannot be individually held for the payment of the debts of that corporation, since the individual liability of stockholders is a creation of statute law, and must affirmatively appear by the provisions of the law controlling the corporation when the debt was incurred. The other corporations mentioned in the act, with the exception of those of the state of California, were organized under the laws of states which impose upon the stockholders of railroad corporations no individual liability for corporate debts. Since the United States had the same national benefits in view in creating the one company and in endowing all the companies with the same grants and franchises, it must be presumed that there was imposed upon the Union Pacific Company and its stockholders every duty and obligation then deemed necessary for the public interest.

In interpreting the language of the act which confers upon the other corporations so aided the benefits mentioned in the act upon the same terms and conditions that were specified in the grant to the Union Pacific Railroad Company, it is just to say, under the circumstances, that more was intended than that the other companies should receive the land grants, the rights of way, the bonds, and the other rights and privileges which were therein enumerated, upon the same terms and conditions that were, by express words, attached to the grant to the company first named. It is true, the grant was to the corporation, and a corporation is a creature of the law, distinct from the members that compose it, and the corporations aided by the

act were and are corporate entities, "artificial beings, invisible, intangible, and existing only in contemplation of law" (Dartmouth College v. Woodward, 4 Wheat. 636); but they were, nevertheless, aggregations of individuals, in essential features differing but little from partnerships. In Muller v. Dows, 94 U. S. 445, it was said that when a suit is brought in the federal courts by or against a corporation "it is regarded as a suit brought by or against the stockholders of the corporation, and for the purpose of jurisdiction it is conclusively presumed that all the stockholders are citizens of the state which by its laws created the corporation." The real parties in interest, the real beneficiaries of the act, were not the corporate names nor the corporate franchises, but the individuals who owned and held the stock and controlled and managed the corporations, and invested money in the railroads. The object of the act was to induce persons to subscribe for stock in the aided corporations, and to invest their private capital in an improvement which was expected to result in great benefit to the government. It was the stockholders, therefore, that were intended to be protected by the act when it declared that all the companies should receive the aid of the United States upon the same terms and conditions. It was to them that the inducement was held forth. It is reasonable to infer that it would have been impossible to obtain subscriptions to stock, or investment of money in this gigantic enterprise, subject to the understood and agreed contingency that the subscribers might not only lose the amount of their stock, but imperil their private fortunes for the repayment of the bonded debt.

In the well-considered case of Ohio Life Ins. Co. v. Merchants' Ins. Co., 11 Humph. 1, 17, the court had occasion to construe the charter of the Merchants' Insurance & Trust Company of Nashville, which had been incorporated under an act of the legislature extending to it the provisions of "An act equalizing the rights and privileges of insurance companies of this state." The act so referred to was the charter of the Knoxville Insurance Company, in which it was provided as follows:

"All rights and privileges granted by this act, which have not heretofore been granted to any of the existing insurance companies of this state, shall be, and the same are hereby granted to them, and that any right or privilege heretofore granted to any existing insurance office in this state is hereby extended to the corporation herein created, so as to place all institutions of the same kind on the same footing."

The court said:

"In construing this statute it is material to observe its obvious and evident intention to place all insurance companies on a footing of equality, and, though 'rights and privileges' are the words employed in the former part of the section, yet, in order to give effect to the intention, it must be understood as implying responsibilities, obligations, and duties also; otherwise insurance companies would not be, as they were intended to be, on a footing of equality. * * * We are of opinion that the Nashville company, in receiving the rights and franchises, incurred also the obligations and duties stated in the charter of the Knoxville company."

The court thereupon, after enumerating the list of rights so conferred upon the Knoxville company by charter, proceeded to hold that

the Nashville company had, by reason of the general provisions of the act just quoted, become subject to all the obligations and restrictions which had been imposed upon the Knoxville company, one of which was the following:

"The individual property, both real and personal, of every stockholder in the said institution shall be held and bound for the payment of the debts of said corporation to the full amount of his or her stock in said corporation."

The distinct doctrine of that decision is that a law imposing individual liability upon stockholders is a law directly applying to the corporation itself, and constitutes an obligation and a restriction upon the corporation. If the stockholders of the Knoxville company, instead of being liable for corporate debts, had been by law made exempt therefrom, the Tennessee court, upon the same reasoning, would have been compelled to hold that such individual immunity possessed by the stockholders of that company passed to the stockholders of the Nashville company by a grant of all the rights and franchises enjoyed by the other company.

In the case of Humphrey v. Pegues, 16 Wall. 244, the Northeastern Railroad Company had been incorporated under an act of the legislature which did not exempt its stock from taxation. Subsequently its charter was so amended that its corporate stock and its real estate were made exempt from taxation during its corporate existence. Thereafter the legislature conferred upon another corporation named "all the powers, rights, and privileges granted by the charter" of the first company. A suit was brought by the stockholders of the second company to restrain the collection of a tax upon their stock. It was held that the privileges so granted to the second company included the exemption of stock from taxation. The court recognized the principle that immunity of stock from taxation, although it is a privilege incapable of being enjoyed by the corporation under its corporate name or in its corporate capacity, and is available only for the protection of the individual stockholder, is nevertheless one of the privileges belonging to the corporation, granted to it by its charter. That principle was subsequently affirmed in Tennessee v. Whitworth, 117 U. S. 139, 6 Sup. Ct. 649, and Keokuk & W. R. Co. v. Missouri, 152 U. S. 301, 14 Sup. Ct. 592.

But there is in the act of 1862 further expression of the intention of the United States to deal equally and impartially and without discrimination with all the other parties to the contract. It is found in the permission which is therein granted to either company, in case of the default of the other, to build all of the road. It thus appears that the attitude of the United States to each company was such that it was a matter of indifference to the government whether the Central Pacific Railroad Company or the Union Pacific Company built the road that was to be aided by the government bonds and subsidy. If, under this permission, the Union Pacific had built the whole road, it is evident that there would have been no individual liability of its stockholders to repay the debt now due the United States, or any part thereof. The same would be true if the Kansas Pacific had built the road. Had the Central Pacific constructed the whole road, if its stockholders are individually liable for this debt,

the United States might now have recourse upon them for the whole of the bonds and interest now due from both corporations. It is impossible to conceive that if congress then had in view the ultimate liability of the stockholders of the Central Pacific Company it would not at the same time have imposed a like liability upon the stockholders of the corporation which it called into existence, and it is likewise impossible to conceive that, while looking to such ultimate liability of the stockholders of the one company and releasing the stockholders of the other company therefrom, there should have been expressed in the act the grant of equal permission and opportunity to each company to obtain bonds, and that no preference should have been expressed as to which corporation should be debtor to the United States for the repayment of the same. It is apparent the United States were not dealing with the Central Pacific Railroad Company of California solely as a corporation created under the laws of that state, and with reference to the powers conferred upon it by its own charter, but as a corporation endowed with the powers which the government had itself bestowed, one of which was the right of way over lands of the United States within the state of California, and another was the express grant of the power to construct and maintain a railroad within the state of California from San José to Sacramento, and eastward beyond the border line of that state, to connect with the Union Pacific. It is with reference to these wider and more comprehensive rights so conferred upon it by the government that its relation to the government is to be measured, and not upon the narrower lines which would control the ordinary contract of an individual with a private corporation. Said Mr. Chief Justice Waite in the Sinking Fund Cases:

"The only material difference between the Central Pacific Company and the Union Pacific lies in the fact that in the case of the Central Pacific the special franchises, as well as the land and subsidy bonds, were granted by the United States to a corporation formed and organized under the laws of California, while in that of the Union Pacific congress created the corporation to which the grants were made." 99 U. S. 727.

In those cases the court sustained the power of congress to require the companies to provide sinking funds against the maturity of the bonded debt, not alone upon the ground that there had been reserved to the United States in the contract the right to amend the acts, but upon the ground that the United States sustained to both companies such sovereign relation as to authorize it to impose reasonable regulations upon the management of the affairs of the corporations. In all its dealings with the two companies the United States has never asserted greater power of control over the Union Pacific Company than over the Central Pacific Company, notwithstanding its sovereign relation to the former. The measure of its right over both is defined in the Sinking Fund Cases. It could take from neither any of the privileges it had bestowed. It could require of neither additional security for the debt. It could impose upon neither restrictions or obligations not already imposed, but it might lawfully require each to make due preparation for the performance of contracts already entered into.

In California v. Central Pac. R. Co., 127 U. S. 1, 38, 8 Sup. Ct. 1073, it was held that the franchises conferred upon the Central Pacific Company could not be taxed by the state without the permission of the general government. In arriving at that conclusion it became necessary to consider the relations sustained by that company to the government under the provisions of the acts which are here under consideration. After referring to the findings of the lower court, in which were set forth the incorporation of the Central Pacific Railroad Company of California and the Western Pacific Railroad Company, their subsequent consolidation, the various acts of congress under the provisions of which there had been constructed a continuous line of railroad from the Missouri river to the Pacific Ocean, the court said:

"If we turn to the acts of congress referred to by the court, we shall find that franchises of the most important character were conferred on this company. Originally, the Central Pacific Railroad Company of California had only power to construct a railroad from Sacramento to the eastern boundary of the state."

The court thereupon, after quoting the terms of the act, proceeded to say:

"Thus, without referring to the other franchises and privileges conferred upon this company, the fundamental franchise was given by the act of 1862 and the subsequent acts to construct a railroad from the Pacific Ocean across the state of California and the federal territories until it should meet the Union Pacific, which it did meet at Ogden, in the territory of Utah. This important grant, though in part collateral to, was independent of, that made to the company by the state of California, and has ever since been possessed and enjoyed. The present company has it by transfer from and consolidation of the original companies, by which its existence and capacities were constituted. Such consolidation was authorized by the sixteenth section of the act of congress of July 1, 1862, and the sixteenth section of the act of July 2, 1864, taken in connection with the second section of the act of March 3, 1865, referred to in the findings of the court. The last-named act ratified the transfer by the Central Pacific to the Western Pacific of a portion of its road extending from San José to Sacramento, and conferred upon the latter company all the privileges and benefits of the several acts of congress relating thereto, and subject to all the conditions thereof. If, therefore, the Central Pacific Railroad Company is not a federal corporation, its most important franchises, including that of constructing a railroad from the Pacific Ocean to Ogden City, were conferred upon it by congress."

The supreme court has repeatedly held that, where corporations are consolidated under and by virtue of an act of congress, they are to be treated as "corporations formed and organized under the act of congress." U. S. v. Central Pac. R. Co., 99 U. S. 450; Ames v. Kansas, 111 U. S. 449, 461, 4 Sup. Ct. 437; Pacific Railroad Removal Cases, 115 U. S. 1, 14, 5 Sup. Ct. 1113. The Kansas Pacific was a corporation originally organized under the laws of Kansas, and afterwards consolidated with the Union Pacific under the laws of the United States. In this respect its relations to the laws of Kansas were like the relations of the consolidated Central and Western Pacific to the laws of California. In the Pacific Railroad Removal Cases (115 U. S. 1–16, 5 Sup. Ct. 1113), the supreme court, speaking of the Kansas road, said that it "must be regarded as a corporation organized under and by virtue of the laws of the United States"; and

it was so treated by the court in considering the relation of that company to the jurisdiction of the United States, for the reason, as there stated, "that the whole being, capacities, authority, and obligations of the company thus consolidated are so based upon, permeated by, and enveloped in the acts of congress referred to, that it is impracticable, so far as the operations and transactions of the company are concerned, to disentangle those qualities and capacities which have their source and foundation in these acts from those which are derived from state or territorial authority."

But perhaps the provision of the act most clearly indicative of the invitation of congress to owners of private capital to invest the same in the stock of these corporations upon terms of equality, and upon the understanding that there should be to all 'alike freedom from individual responsibility, is that which authorizes the consolidation of said corporations, or any two or more thereof, for the building of the whole or any portion of the road. If the Union Pacific Railroad Company had, in pursuance of this permission, consolidated with the Central Pacific, either before or after the construction of the roads, it is obvious that the government would now have no recourse to the individual liability of any stockholder in such consolidated corporation. It would be impossible for a portion of the stockholders to stand in one attitude to the United States while the remainder stood in another. Under such consolidation, accomplished by authority of the United States, it is manifest that all members must necessarily have stood upon an equal footing; and, as some were free from individual liability, it follows that all must have been free. It is clear that the stockholders of the Union Pacific Company, by amalgamating with the Central Pacific, would not have been made subject to the individual liability imposed upon the latter company by the laws of California; and it is equally clear that the stockholders of the Central Pacific Railroad Company, going into such a consolidated corporation, must have stood upon an equal footing with others, at least so far as concerned the contract rights of the United States, which, by the language of the statute, had invited the two companies thus to join in one. And the act so indicates in terms. The amendment of 1864 expressly provides that such consolidated corporation "shall succeed to, possess, and be entitled to receive from the government of the United States, all and singular the grants, benefits, immunities, guarantees, acts, and things to be done and performed, and be subject to the same terms, conditions, restrictions, and requirements which said companies respectively, at the time of such consolidation, are or may be entitled or subject to under this act, in place and substitution of said companies so consolidated respectively." Here is a distinct declaration of the absolute equality of the terms, conditions, restrictions, and immunities which then existed, and were possessed not alone by all the companies, but by the stockholders of all the companies, so far as concerned the United States. The act says that those grants, immunities, and conditions are, before the consolidation, one and the same thing for each of said corporations, and that after consolidation the attitude of the stockholders of the consolidated company will not be different from that of the stockhold-

ers of the companies so uniting. It is the plain import of the words here used that the United States not only agreed not to look to the individual liability of any stockholder of such consolidated corporation, but that, in the view of congress, the relation of no stockholder to the United States would be changed by such consolidation, and that no remedy or right of recourse of the government for the enforcement of the bonded debt would be impaired or affected thereby. Had such consolidation taken place, the new company would have been a corporation created under the laws of the United States, which permitted the consolidation, and prescribed the terms and method thereof. Where two railroads are consolidated into one, it is true that, so far as concern the duties and restrictions theretofore imposed upon the roads, each remains unaffected by the consolidation, for the roads themselves remain unchanged. Tomlinson v. Branch, 15 Wall. 460; Branch v. Charleston, 92 U. S. 682. But such is not the case with the status of the stock and the stockholders. The old stock is surrendered, and new is issued, and, as to all debts thereafter incurred, it is obvious that all stockholders sustain one and the same relation to the creditor. Shields v. Ohio, 95 U. S. 319; Railroad Co. v. Maine, 96 U. S. 499; Tennessee v. Whitworth, 117 U. S. 139, 6 Sup. Ct. 649; Keokuk & W. R. Co. v. Missouri, 152 U. S. 301, 14 Sup. Ct. 592.

It is well-settled law that the creditor of a corporation may, by express contract at the time the debt is incurred, waive his right to collect from the stockholders debts which the corporation may fail to pay. "If a person chooses to deal with a partnership or joint-stock company upon the terms that its funds, and they only, shall be available to make good his demands, he cannot afterwards depart from those terms, and hold the members individually liable, as if no such restriction had been agreed to. * * * This right, although secured in express terms, may be waived by the creditor by express contract; and it is equally free from doubt that it may be waived by conduct on the part of the creditor, either at the time of making the contract or subsequently, indicating a clear understanding between the contracting parties that the creditor is to look only to the corporate funds, and not to the individual liability of the shareholders." 3 Thomp. Corp. pp. 2163, 2164, § 3008; Basshor v. Forbes, 36 Md. 154; Brown v. Slate Co., 134 Mass. 590; Ohio Life Ins. Co. v. Merchants' Ins. Co., 11 Humph. 1.

It is our judgment that the terms of the contract between the United States and the Central Pacific Railroad Company, so far as concerns the waiver of the individual liability of the stockholders of that company, fully meet the requirements of this exposition of the law. The statutes of the United States, the policy and scheme of the government in undertaking the internal improvements, the uniform course of dealing of the United States with all the corporations which entered into contract relations with them, were clearly sufficient to justify the belief of all shareholders that the right of recourse against the individual members of the companies created under the laws of California was waived by the United States; and the course of subsequent action of the United States with reference

to these corporations is confirmatory of that view. It was in the light of these facts that the stockholders subscribed to the stock, and there can be no doubt that they became and remained shareholders by reason of their faith and reliance in that understanding. The controlling canon of interpretation of contracts is to ascertain what the parties themselves meant and understood. We hold that this was what was meant and understood by the parties to this contract. It has been urged upon the argument that the directors of the Central Pacific Railroad Company, one of whom was the defendant's testator, have wrecked that company, have depleted its treasury, and have thereby acquired private fortunes of great magnitude. This argument is foreign to the question under consideration. This suit is brought to enforce a liability which, if it exist, is purely a creature of statute. The question before the court is one of the interpretation of the law and the contract of the parties in interest. The inquiry is not aided by reference to the inequitable conduct of the directors of the Central Pacific Railroad Company after the contract was entered into. The rights of the defendant in this case are to be measured by the same rules that would apply to an obscure stockholder, innocent of wrong to the government, and unclothed with power to direct the action of the corporation as an officer thereof. The rights of the defendant here depend upon the contract and the law applicable thereto. They may not be impaired by reason of the inequity, if any there were, of the defendant's testator in his dealing with the United States. If it be true, as alleged, that the money and the land of the United States which were given in aid of the construction of the Central Pacific Railroad have been diverted from the purpose for which they were bestowed, there is undoubtedly an adequate remedy in a suit brought to reach such diverted assets. There is no such remedy in this suit. The view we have taken of the main question involved in the controversy renders it unnecessary to consider the other questions which were discussed. It is our judgment that the demurrer to the bill was properly sustained for want of equity, and the decree of the circuit court is accordingly affirmed.