Marshall, C. J.
 

 These eases do not present a question of liability of stockholders where the indebtedness was incurred prior to November 3, 1903, and where the secondary liability has not been waived, but the question presented for determination is whether the waiver of liability at the time of the execution of the bonds and mortgage is valid and effective for any purpose, and, if so, whether it is effective in favor of the stockholders of the consolidated company, the Cincinnati, Dayton
 
 &
 
 Toledo Traction Company.
 

 For the purposes of this discussion, it is admitted by the stockholders that, except for the waiver, they would be liable, and it is claimed that by reason of the waiver the exemption from liability extends not only to the stockholders of the Southern Ohio Traction Company, but also to the stockholders of the consolidated company as successor thereto.
 

 It is asserted by the bondholders, on the other
 
 *145
 
 hand, that the waiver never had any validity in law and that if they are found to be mistaken in this, the consolidated company has assumed the obligations of the bonds, and that the stockholders of the consolidated company are not within the terms of the exemption.
 

 It will be our first task to inquire whether the waiver provision is valid.
 

 It is claimed that the liability of stockholders created by the Constitution of 1851 is of such a nature that any contract whereby any creditor of a corporation agrees to waive the secondary liability is contrary to public policy and void.
 

 This inquiry involves a careful examination of the nature of the waiver and of the policy which prompted the people to insert this clause in the Constitution of 1851.
 

 A “waiver” is the voluntary surrender or relinquishment of a known legal right or intentionally doing an act inconsistent with claiming it. In the fomrier case it amounts to an agreement and must be supported by a consideration which may be either a benefit to the promisor or a disadvantage to the promisee. In the latter case, it may be accomplished by acts or conduct and there may be an estoppel from insisting upon the right claimed to have been relinquished, in which event no consideration is necessary.
 

 It may be admitted that legislation which would attempt to abrogate the double liability would contravene the Constitution and would be ineffective; it may also be admitted that any attempt by corporate resolution, or even by provisions in the articles of incorporation, would be equally
 
 *146
 
 futile; and it may also be admitted that any other action toward general exemption of stockholders from the liability created by the Constitution would be without effect.
 

 On the other hand, when a corporation gives to a certain class of creditors a priority of payment by collateral security upon all its tangible and intangible property, including income, and as a condition to such priority reserves to its general and unsecured creditors the sole resort to the secondary liability, and holders of such securities consent thereto, a situation is presented which calls for the application of very different principles.
 

 It may further be admitted that to be effective this particular kind of waiver must amount to an agreement and must be based upon a consideration. Such waiver subsists in contract, and the collateral security which takes away from the general creditors practically every hope of repayment out of the property of the corporation must be held to give rise to a supporting consideration in favor of the waiver.
 

 It is insisted, however, that this secondary liability is of such a nature that it is contrary to public policy to waive it. “Public policy” is “that principle of the law which holds that no subject can do that which has a tendency to be injurious to the public or against the public good.”
 

 While it is well settled that, where the good of the community requires it, freedom of contract and private dealing may be restricted by law, this power is only exercised where some positive harm would result to the people generally, or where it involves something more than a mere relinquish
 
 *147
 
 ment of benefits secured by a constitutional or statutory provision. Examples of valid restriction are where contracts are calculated to defeat public justice or hinder competition in trade, or which affect public morals, and other matters of like nature. The principle has its basis in sovereignty and in the subserviency of the individual to the public g’ood, in promoting the public health, the public morals, or in stabilizing the public confidence.
 

 It is difficult to see how any of these things will be affected either way by the liability or non-liability of stockholders where creditors voluntarily consent and agree to nonliability at the time the indebtedness is incurred, and especially where they receive other considerations which have been found by universal experience to be of great value, and where the benefits they waive are such as have proven to be of very doubtful value.
 

 We have in the instant case a solemn contract entered into upon a fair and adequate consideration, by persons competent to contract, and the sanctity to be attached to such a contract makes an appeal to considerations of public policy which are quite as strong as the demand for corporate integrity and for stabilizing the business structure of the state.
 

 We have been referred to the constitutional debates in the convention of 1851 and the arguments made in support of the constitutional provision. The debates were an arraignment of the corporations, which were quite persuasive at that period, but the next 50 years witnessed a great change in public opinion. Very many corporations doing
 
 *148
 
 business in Ohio found it necessary to organize under the laws of other states. This gradual change of sentiment finally crystallized in 1903 and resulted in doing away with the double liability entirely. Public policy is variable and properly changes with the changing laws, customs, and habits of the people. The commercial, industrial, and scientific progress made between 1851 and 1902 produced a relative change in the thought and sentiment of the people, as was clearly shown by the action of the people in adopting the amendment of 1903. The debates o.f 1851 would have found no reaction in 1902. We are therefore' concerned with the public policy of 1902 rather than that of 1851.
 

 Counsel for the bondholders have quoted from the opinion of Judge Bradbury in the case of
 
 Boice
 
 v.
 
 Hodge,
 
 51 Ohio St., 236, 238, 37 N. E., 265, 266 (46 Am. St. Rep., 569), as follows:
 

 “The principle of holding stockholders of corporations liable for corporate debts is within the public policy of the state.”
 

 We think this is a self-evident proposition. It is not disputed that when the Constitution of 1851 declared the additional liability of stockholders, that declaration became the policy of the state upon this subject, and that such policy continued until the constitutional change in 1903. That constitutional provision, however, as stated by Judge Bradbury, merely declared that this was the policy, but did not declare that there should be no immunity from such liability. A right or claim arising out of legislation, or even out of constitutional provisions, where the public morals, the
 
 *149
 
 public safety, the public health, or the public confidence, is not directly concerned, may nevertheless be voluntarily waived, and this has. been so often decided and in such a variety of cases that it is unnecessary to cite them. It has been decided by this court more than once that persons accused of crime may waive the right of trial by jury, and this doctrine has even been applied to a ease involving an accusation of first degree murder.
 
 Craig
 
 v.
 
 State,
 
 49 Ohio St., 415, 30 N. E., 1120, 16 L. R. A., 358;
 
 State ex rel. Wafner
 
 v.
 
 Baer,
 
 103 Ohio St., 585, 134 N. E., 786.
 

 If the Constitution had declared an inhibition against immunity from liability of stockholders, it would be beyond the power of legislatures, courts, corporations, and individuals to disregard it. But having only declared a liability, the parties for whose benefit it was declared may by contract waive it as they may waive any other legal right, where sovereignty is in no wise concerned.
 

 The diligence of counsel has brought forth a large number of cases where the principles are somewhat analogous, but we are not cited to a single case decided by a court of last resort where it has been directly decided that the waiver of a statutory or constitutional declaration of liability is against public policy and therefore void. On the other hand, counsel for the stockholders have cited us to numerous authorities from other states, which are directly in point:
 
 Robinson
 
 v.
 
 Bidwell,
 
 22 Cal., 379, 388;
 
 French
 
 v.
 
 Teschemaker,
 
 24 Cal., 518, 559;
 
 United, States
 
 v.
 
 Stanford,
 
 70 Fed., 346, 17 C. C. A,, 143;
 
 Bush
 
 v.
 
 Robinson,
 
 95 Ky., 492, 26 S. W., 178;
 
 Basshor
 
 v.
 
 Forbes,
 
 36 Md., 154;
 
 Kohn
 
 
 *150
 
 v.
 
 Sacramento Electric, Gas & Ry. Co.,
 
 168 Cal., 1, 141 Pac., 626.
 

 This proposition has not been directly decided by the Supreme Court of the United States, but it was so decided by the Circuit Court of Appeals for the Second Circuit, and the Supreme Court of the United States denied an application for certiorari. That was the case of
 
 Babbitt
 
 v.
 
 Read,
 
 236 Fed., 42, 149 C. C. A., 252, The action upon application for certiorari is reported in 243 U. S., 648, 37 Sup. Ct., 475, 61 L. Ed., 945.
 

 A discussion of this principle will be found in the following texts: 14 Corpus Juris, 1040; 1 Cook on Corporations (8th Ed.), Section 216; Morawetz on Private Corporations, Section 871; 4 Thompson on Corporations, Section 4762; 2 Williston on Contracts, p. 1316.
 

 We have therefore reached the conclusion on this branch of the case, that the additional liability created by Section 3, Article XIII, of the Constitution of 1851, and Section 3258 of the Revised Statutes, may be waived, and that the condition in the bonds issued by the Southern Ohio Traction Company was based upon a valid consideration, and that the waiver is therefore effective.
 

 If, upon an inquiry into the foregoing principles, we had reached a contrary conclusion, to wit, that a waiver of stockholders’ liability was against public policy, we would still feel bound to reach the same general result that we have already reached, because the policy of 1851 was no longer the policy after 1903, and even though the waiver should be found not to be enforceable prior to
 
 *151
 
 1903, it became enforceable after, that elate.
 
 Johnson
 
 v.
 
 Bentley,
 
 16 Ohio, 97;
 
 Trustees of Cuyahoga Falls Real Estate Ass’n.
 
 v.
 
 McCaughy,
 
 2 Ohio St., 153;
 
 Ewell
 
 v.
 
 Daggs,
 
 108 U. S., 143, 2 Sup. Ct., 408, 27 L. Ed., 682.
 

 We would further be bound to reach the same conclusion, upon the equities of this case. It has always been recognized by the framers of the Constitution, by legislatures, and by the courts, that promoting public transportation service is in furtherance of the public welfare. It cannot therefore be contrary to sound public policy to permit a railroad corporation to contract for a waiver of the secondary liability of stockholders in favor of those who are receiving collateral security for debts and reserving the secondary liability to those who deal with the railroad corporation without security, thereby permitting the transportation company to have such credit as will enable it to purchase ordinary supplies and to contract debts for current operating expenses. However important the Constitution framers of 1851 may have deemed it to make provision for the ultimate payment of all corporate debts, it must be admitted by all persons who give earnest thought to the matter that it is not an unsound policy to make such special provision for unsecured creditors as the class of secured creditors may be willing to give their consent.
 

 We will next inquire whether the exclusion and waiver of stockholders’ liability applies to the Cincinnati, Dayton & Toledo Traction Company. This question turns upon the proper construction of the waiver clause in the bonds, the consolidation
 
 *152
 
 agreement, and the statutes of Ohio relating to consolidation of railroad corporations.
 

 It is contended by the bondholders that the waiver clause is limited to the stockholders of the Southern Ohio Traction Company, and that it does not by its terms extend to the successors and assigns of that company. It is contended by the stockholders that that clause itself indicates that the exemption of stockholders’ liability was intended to reach not only present but all future corporations into which that company might be merged, and that the expression “such liability being taken to be waived by such holder” means that the liability of stockholders shall not under any circumstances be asserted by the holders of such bonds. It is further contended that if it was only intended to waive the liability of stockholders of the original company, the expression “said liability” would have been employed instead of the expression “such liability.’’ It is altogether probable that at the time the bonds were purchased, in which the waiver was included, and at the time the holders of the bonds purchased the same, in 1900, neither bondholders nor stockholders gave any particular thought to the matter, and it is improbable that the stockholders then had any idea that a consolidation would later be effected or that the purchasers of the bonds contemplated at that time that a consolidation would later take place or that they depended or relied upon any possible additional security as an inducement to the purchase. At the very outset cf the discussion of this branch of the ease, it must be kept in mind that the bondholders are not now seeking
 
 *153
 
 to recover something they contracted for, or which they even contemplated at the time of purchasing the bonds. The consolidation statutes were then in force and had frequently been utilized by railroad corporations prior to that time. But it cannot now be said that the purchasers of the bonds had those things in mind as an inducement to their investment. If they succeed in this controversy, they will reap where they have not sown. If they fail, they still have everything they directly contracted for or contemplated at the date of the contract.
 

 In order to give meaning to every part of the waiver clause, and seeking to determine the intention of the parties to that agreement without aiding the construction by reference to the consolidation agreement and statutes, the language therein employed is open to either interpretation, and we will therefore turn to the effect of the consolidation agreement and the statutes.
 

 The consolidation agreement, in paragraph 9 thereof, contained the following provision:
 

 “The Cincinnati, Dayton & Toledo Traction Company assumes all of the debts, liabilities and contracts of the constituent companies, and is to pay off and extinguish all debts and liabilities of every kind and nature of each constituent company.”
 

 This language very clearly makes all of the indebtedness of the constituent companies reach to the consolidated company if any provision was necessary to accomplish that purpose. An examination of Section 9038, General Code, shows that no such provision was necessary to be inserted in
 
 *154
 
 the consolidation agreement. The statutes which authorize a consolidation impose a condition to such authority that the consolidated company shall become responsible for all such debts and liabilities. The latter part of that section is a® follows:
 

 “But rights of creditors, and liens upon the property of either company, shall be preserved unimpaired, and the respective companies deemed to be in existence to preserve them. Debts, liabilities, and duties of either company thenceforth shall attach to the new company, and be enforced against it to the same extent as if such debts, liabilities, and duties had been contracted by it.”
 

 We have no difficulty in reaching the conclusion that the assumption of such debts in the consolidation agreement does not affect this situation either way.
 

 This brings us to the last branch of the inquiry as to whether the Cincinnati, Dayton
 
 &
 
 Toledo Traction Company is to be viewed, for the purposes of this inquiry, as a new corporation and in the light of a purchasing corporation, or whether it is to be viewed as á merger of the two constituent companies, and therefore standing in the same relation to the bondholders as the constituent companies had theretofore stood.
 

 The character of the consolidated company has been the subject of inquiry at the hands of this court in numerous cases, and former members of this court in published opinions have uttered a variety of expressions, some of which indicate that it is an entirely new corporation, others indicating that it has the characteristics of a merger. Each and all of those expressions must be weighed in
 
 *155
 
 relation to the facts which were the subjects of those controversies respectively. The identical question now under consideration has never before been before this court for determination, and, strange as it may seem, it has never been decided by the courts of other states having statutes somewhat similar.
 

 The original waiver agreement, being a part of an agreement to which the bondholders were not express parties, and the agreement having been made on their behalf by the Southern Ohio Traction Company, it must first be determined whether the liability of stockholders is a part of the corporate liability or whether it is separate and distinct therefrom and in the nature of a surety-ship.
 

 The authorities áre quite diverse on this point, but the carefully considered cases clearly favor the proposition that the liability of stockholders is a part of the corporate liability. It was the plain purpose of the inventors of the corporate scheme to pláce a limit upon the liability of those who should become members of business aggregations. Partners were liable in an unlimited amount. Corporations had' a separate entity, and stockholders were therefore not liable beyond the amount of their investment in the corporation. By Constitution and statutes in some of the states this liability was increased to an amount equal to the par value of their stock. The liability did not, however, rest upon them as individuals, but as members of the corporation. The liability became fixed by the fact of subscribing to stock in the corporation and attached
 
 *156
 
 at the time of incurring obligations by the corporation, and yet under the well-settled trend of the authorities, it did not become available to creditors except in the event of the insolvency of the corporation which owed the primary liability. The liability is not technically contractual, except in the sense that any statutory obligation becomes a' part of and must be read into a contract to which it applies, and the secondary liability of a stockholder is not a primary obligation enforceable as such in a suit at law between a creditor and the stockholders of the corporation. The liability creates a trust fund to which all stockholders within the jurisdiction must ratably contribute and in which all creditors who have a right to assert the liability may ratably participate. After insolvency, and only in the event of insolvency, a court of equity may entertain the case, render an accounting and ascertain the validity of claims and the liability of stockholders and render the judgment.
 

 It follows from the foregoing that the obligation of the additional liability of stockholders is not a contractual obligation, but an obligation imposed by the Constitution as a condition to the granting of the corporate franchise, and therefore wholly inseparable therefrom. This inseparable characteristic of the additional liability is recognized ini
 
 Boice
 
 v.
 
 Hodge,
 
 51 Ohio St., 236, 37 N. E., 265, 46 Am. St. Rep., 569, wherein it is decided that a stockholder cannot relieve himself from the statutory liability by transferring his stock. It is again recognized in
 
 Brown
 
 v.
 
 Hitchcock,
 
 36 Ohio St., 667, at page 678, of the opinion, from which we quote:
 

 
 *157
 
 “Our Constitution and laws therefore make it an essential condition to persons thus availing themselves of the instrumentality of a corporation for the transaction of business that the security of their personal liability shall attach to and attend all corporate liabilities.”
 

 In the case of
 
 United States
 
 v.
 
 Stanford, 70
 
 Fed., 346, 17 C. C. A., 143, the Court of Appeals of the Ninth Circuit dealt with this question. The learned judge in the course of his opinion was discussing the case of
 
 Ohio Life Ins. & Tr. Co.
 
 v.
 
 Merchants’ Ins. & Tr. Co.,
 
 11 Humph., 1, 17 (53 Am. Dec. 742), in which the Tennessee court was construing the charter of the Merchants’ Insurance Company, in which charter the Legislature extended to that company the benefit of the rights and privileges conferred by a former charter to the Knoxville Insurance Company, and the court held that in accepting the rights and privileges expressly conferred that it would be understood as impliedly agreeing to be subject to the responsibilities, obligations, and duties which attached to the Knoxville charter. In further commenting upon the Tennessee decision the court said:
 

 “The distinct doctrine of that decision is that a law imposing individual liability upon stockholders is a law directly applying to the corporation itself, and constitutes an obligation and a restriction upon the corporation.”
 

 The bondholders were therefore bound by all the conditions of the bond, though they were not parties thereto at the time it was executed.
 

 The character of the consolidated company must
 
 *158
 
 be determined from a construction of the consolidation statutes. The consolidation agreement between the Southern Ohio Traction Company and the Cincinnati & Northwestern Railway Company was drawn in accordance with Section 9028, General Code, and the agreement accordingly stipulated the name of the consolidated company, the directors who should hold office until after the consolidation was effected and a new board chosen, the persons who should be the executive officers of the consolidated company, the amount of the capital stock and the ratio of distribution of same among the stockholders of the two constituent companies, the bonded indebtedness which should be issued and the purposes for which the proceeds thereof should be employed, and it appears from all the covenants of that agreement that nothing was sought to be done except to provide for the future conduct of the old enterprise under joint management and operation, with a single board of directors and set of executive officers rather than two separate and distinct organizations. The Cincinnati, Dayton & Toledo Traction Company did not become the owner of any property which had not theretofore been owned by the constituent companies. It did not provide for any new stockholders or for the distribution of any of its stock or securities to persons other than those who had been stockholders of the constituent companies, and in all respects that agreement will be found to contain only provisions pertaining to the merger of the ownership of the property by the identical stockholders who had' theretofore owned the stock in the constituent companies. 'A careful analysis of
 
 *159
 
 that agreement shows that it was the same identical enterprise to be thereafter conducted under a different name; or, rather, to be conducted under a single name rather than under two names, as it had theretofore been conducted. On the assumption that the agreement was fair to both companies, every stockholder would own stock of the same value as before, though it might be represented by different certificates of different nominal value.
 

 It is true that under the statutes any dissatisfied stockholder might have demanded that his interest be paid to him in money, but it does not appear that there were any dissatisfied stockholders, and so far as this record discloses all stockholders of each of the constituent companies became stockholders in the consolidated company.
 

 Passing from a consideration of the agreement, let us consider some of the provisions of the statutes. We find nothing in the statutes requiring the selection of a new name. They might therefore have adopted either of the names of the constituent companies. No articles of incorporation were necessary, it being provided that the agreement should be filed in the office of the secretary of state, and Section 9029, General Code, provides that when the agreement is made and perfected and filed in the office of the secretary of state, “the several companies parties thereto shall be deemed and taken to be one company, possessing within this state all the rights, privileges, and franchises, and subject to all the restrictions, disabilities, and duties, of a railroad company.” There is no requirement that the consolidated company shall pay to the secretary
 
 *160
 
 of state the usual fees which are required to be paid upon the organization of a new corporation, it being only provided that a fee shall be paid in the event of an increase of the capital stock. No subscriptions to stock are required, but the stock of the new company is distributable to the stockholders of the constituent companies in the ratio agreed upon in the consolidation agreement. While the statutes as well as the consolidation agreement in this case provided for calling a meeting of stockholders to elect a board of directors, and the same agreement also provided for a complete board of directors and corps of executive officers, the organization of the new corporation was entirely complete upon the filing of the agreement in the office of the secretary of state, all of which preceded the stockholders’ meeting for the election of a new board of directors.
 

 It will be observed that Section 9029, Genera] Code, refers to the consolidation as “one company,” and that it . does not either expressly or impliedly refer to it as a new corporation. Section 9030 also contains the significant language:
 

 “A copy of the agreement and act of consolidation, duly certified by the secretary of state, shall be received in the courts of this state as
 
 prima facie
 
 evidence of the existence of the several companies parties to it, prior to and at the time of the execution of the agreement of the consolidation of the companies, as specified in the agreement,” etc.
 

 The consolidation agreement 'which takes the place of articles of incorporation is not required to set forth the corporate purposes of either com
 
 *161
 
 pany, and it is entirely clear that the new company, so called, has the same corporate purposes and authority which were contained in the articles of incorporation of the constituent companies. Under all these circumstances it is difficult to see upon what theory it is claimed that the new company has an entity or even an existence separate and distinct from the existence of its constituents.
 

 As a climax to the statutory provisions referred to, we quote the provisions of Section 9038:
 

 “Upon the election of the first hoard of directors for the company created, hy the agreement of consolidation, all the rights, privileges, franchises of each company to the agreement, and all property, debts due on account of subscriptions for stock, or other things in action, are to be deemed transferred to and vested in such new company, without further act or deed. All property, rights of way, and other interests, shall be as effectually the property of the new company as they were of the companies parties to the agreement. Title to real estate either by deed, gift, grant, or by appropriation under the laws of this state, shall not revert or be impaired by reason of the consolidation. But rights of creditors, and liens upon the property of either company, shall be preserved unimpaired, and the respective companies deemed to be in existence to preserve them. Debts, liabilities, and duties of either company, thenceforth shall attach to the new company, and be enforced against it to the same extent as if such debts, liabilities, and duties had been contracted by it.”
 

 If, upon a careful analysis of the foregoing sec-
 

 
 *162
 
 tion, it is said that the respective corporations are deemed to be in existence for the
 
 sole
 
 purpose of preserving the
 
 rights of creditors,
 
 it may be answered that it would be a strange conception of sound legislation which would be applicable only to the “rights” without taking into consideration the corresponding duties, and it would be stranger still if “rights” should be thus carefully safeguarded without incumbering those rights with duties and obligations which were attached as conditions to the original acquisition of the right.
 

 Applying that thought to the instant case, the situation would be practically as follows: the “rights,” that is to say, the bonds, were secured to be paid by a mortgage upon all the property of the corporation including its income, subject to a condition that the additional liability of stockholders should be waived. Such rights being safeguarded by the old companies, which are deemed to be in existence to preserve those rights, the waiver, which was a condition to the giving of the right, must be held to be equally safeguarded in order that the right as at first granted “shall be preserved unimpaired. ’ ’
 

 That principle of mutuality which is the essence of justice requires that if the right shall not be reduced, neither shall it be increased by stripping from it conditions which originally attached to it. It was perhaps not strictly necessary to enact the provisions of Section 9038. The guaranty of the inviolability of contract contained in the federal Constitution was undoubtedly as complete a protection and safeguard as the very definite provisions of 'Section 9038. If Section 9038 should be
 
 *163
 
 so narrowly construed as to safeguard the affirmative covenants -and agreements executed by the constituent companies, but to destroy the conditions attached to such agreements, a question of its constitutionality would instantly arise.
 

 It is claimed by the bondholders that a consolidation under the Ohio statutes is not a merger. Ingenious arguments. are advanced in support of this theory, and some authorities are cited which have a leaning in that direction. Let us turn to the dictionary to ascertain the meaning of each of those words. “Consolidation” means “to make solid or firm; united, compressed or packed together and formed into a more compact mass, body or system.” “Merger” means “to sink or disappear in something else; be swallowed up, lose identity or individuality.” Whatever word may be employed in the statute, it is not difficult to determine which of the two words is the more pertinent. From the standpoint of the lexicographer the word “consolidate” is not applicable. From the same standpoint the word “merge” is peculiarly applicable.
 

 While the courts of other states have in several instances decided that consolidation is not a merger, it may well be that those cases were decided in accordance with peculiar statutory provisions obtaining in those jurisdictions. The Supreme Court of this state has never so decided. The Supreme Court of the United States has, however, given us the benefit of an interpretation of the Ohio consolidation statutes. In the case of
 
 Wabash, St. L. & Pac. Ry. Co.
 
 v.
 
 Ham,
 
 114 U. S., 587, 5 Sup. Ct, 1081, 29 L. Ed., 235, four railroads in
 
 *164
 
 Ohio, Indiana, and Illinois were consolidated according to the statutes of all of those states. It was necessary that the consolidation agreement be in accordance with the statutes of each state. Mr. Justice Gray, in a very clear opinion, considered the statutes of each of the states. At page 595 (5 Sup. Ct. 1085) we find the following:
 

 “The effect of the Ohio Consolidation Act was to merge the old corporation into the new one, which took their place, succeeded to their property and assumed their liabilities.
 
 Shields
 
 v.
 
 Ohio,
 
 95 U. S. 319;
 
 Railroad Co.
 
 v.
 
 Georgia,
 
 98 U. S. 359. The liability imposed by that statute upon the new corporation for the debts of the old ones is the same as theirs, neither greater nor less.”
 

 As between the decisions of other states construing other statutory provisions and the decision of the Supreme Court of the United States construing the Ohio statutes, we have no hesitation in following the latter.
 

 The doctrine of merger rather than the theory of a new, separate, and distinct corporation must be weighed and considered in connection with the doctrine already discussed that the liability of stockholders is inseparable from the corporate liability. And when the two doctrines are joined the conclusion is irresistible that the consolidated company merely steps into the shoes of the constituent companies. This conclusion disposes of the case, but it is proper to add that our conclusions are in' harmony with the declarations of this court in the case of
 
 Citizens’ Sav. & T. Co., Trustee,
 
 v.
 
 Cincinnati & Dayton Traction Co.,
 
 106 Ohio St., 577, 140 N. E., 380. In that case the bond
 
 *165
 
 holders were not personally before the court, but their rights as lienholders were urged by their authorized trustee; whereas, in this case they appear by one of their number who appears in behalf of all. The stockholders were likewise not personally before the court, being represented by the corporate entity. In that case many facts were established which do not appear in the pleadings of this ease, but inasmuch as some of those facts have been urged in argument and appear in the report of the former ease and may therefore be judicially noticed by this court at this time, it is proper to refer to them in considering the equities of the instant case.
 

 The trustee for the bondholders in the former suit was seeking to reach after-acquired property by virtue of a clause in the mortgage to that effect, which clause did not by its terms apply to the successors of the Southern Ohio Traction Company. It was then decided by this court that notwithstanding the omission to make the after-acquired property clause applicable to successors, the provisions of Section 9038, G-eneral Code, necessarily produced that effect, because the substantial existence of the constituent companies was thereby perpetuated by being merged in the consolidated company. This proposition was declared in the syllabus of that case as follows:
 

 “9. Upon consolidation of several railroads under authority of and in accordance with the provisions of Ohio statutes, the nominal existence of the several constituent companies is terminated, but their substantial existence is perpetuated by being merged in the consolidated company.
 

 
 *166
 
 “10. In a railroad mortgage conveying after-acquired property, in the absence of countervailing reasons, the mortgage will include property acquired by a successor to the mortagor, even though successors are not expressly stipulated.”
 

 The bondholders are thereby given the benefit of property acquired by the Cincinnati, Dayton & Toledo Traction Company subsequent to the consolidation. This principle was strongly urged by the trustee representing the bondholders at that time and opposed by the corporation and other subsequent lienholders. Having sustained the views of the bondholders at that time and having interpreted Section 9038, General Code, in such manner as to perpetuate the substantial existence of the constituent companies, it would be inequitable at this time to declare a different rule. If the after-acquired property clause in the mortgage was properly made available to the prior lienholders as against the consolidated company, on the theory that it had only a nominal existence, the same rule of construction should now be applied to the same statute to make the exemption clause contained in the bonds available to the nominal stockholders of the consolidated company.
 

 The facts heretofore referred to, which appeared in the former case but which do not appear in the pleadings in this case, are that a large sum of money was paid as interest upon the bonds distributed to the stockholders of the Southern Ohio Traction Company. This fact is being urged by the bondholders. The exact amount of this interest does not appear, but it is quite certain that that interest was paid at a time when there was no
 
 *167
 
 default upon the part of the consolidated company in paying interest upon the prior lien bonds, neither was there any default in the discharge of any other duty owing under that mortgage. If the interest upon the bonds held by the stockholders of the Southern Ohio Traction Company was paid at a time when there were surplus earnings, it would not be any more improper to pay the interest upon those bonds than it would have been to pay dividends upon the stock out of such surplus earnings, and the result to the prior lienholders would be the same in either case.
 

 Again, it was established in the former controversy that the consolidated company and its lessee had expended large sums of money, either out of surplus earnings or by the sale of bonds, or by expenditures made by the lessee which were never reimbursed to it, all such expenditures being for power plant, transmission lines, and other property acquisitions upon which the lien of the first mortgage bonds attached, and all these beneficial results flowed from the aforesaid interpretation of Section 9038. All these things further emphasize' the equities in favor of the stockholders.
 

 We have therefore reached the conclusion that upon principle, upon authority, and upon the equities of this particular case, the stockholders of thg Cincinnati, Dayton & Toledo Traction Company are exempt from individual liability.
 

 Judgment affirmed.
 

 Robinson, Jones, Matthias, Day, and Allen, JJ., concur.