DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal is from a judgment issued by the Lucas County Court of Common Pleas following a jury verdict awarding damages for breach of contract. Because we conclude that the trial court properly denied appellant's motions for directed verdict, judgment notwithstanding the verdict, and summary judgment, but improperly denied appellee's motion for prejudgment interest, we affirm in part and reverse in part.
 Background {¶ 2} In February 1998, appellant/cross-appellee, J. Richards Industries, LP ("J. Richards"), contracted with appellee/cross-appellant, Stanley Machining, Inc. ("SMI"), to build and deliver a drill and tap machine for a price of $105,005. J. Richards tendered a down payment of $52, 502.58. Due to a variety of problems and modifications, the machine was not completed by the original projected delivery date of May 23, 1998. Over the next two years, the parties worked together to obtain a satisfactory machine. Eventually, in early April 2000, J. Richards, no longer interested in the machine, demanded the return of its down payment. Several days later, SMI sent J. Richards an invoice for $294,368.40 which included $210, 318.19, the cost for requested modifications, and credit for the down payment. On June 30, 2000, SMI notified J. Richards that the machine was ready for delivery and requested scheduling for "run-off procedures." J. Richards did not respond to the invoice or "run-off" notice.
 {¶ 3} Instead of taking delivery of the machine, in July 2000 J. Richards filed suit claiming breach of contract and requesting the return of its deposit, less amounts owed to SMI for two unrelated projects. SMI filed an answer and counterclaimed for breach of contract, seeking the remaining amount allegedly owed on the drill and tap machine and its two other completed projects. Both parties filed motions for summary judgment. J. Richards' motion for summary judgment on SMI's counterclaims was denied. SMI's motion for judgment on the undisputed amounts owed for the unrelated projects was granted; any action on these accounts was stayed until the case concluded.
 {¶ 4} The case was heard by a jury. J. Richards presented testimony and documents that it had contracted with SMI in February 1998 for a drill and tap machine with certain specifications. For its witnesses, J. Richards called Garrett Gillen, an engineer employed by J. Richards; Del Drinkwater, SMI plant manager; and Stanley Tambor, Jr., president of SMI. According to Gillen, the original May 1998 delivery due date was extended because of problems with the machine. Gillen presented SMI with a second written agreement, dated in September 1999, to provide for a "final delivery date" of December 10, 1999. Gillen testified that J. Richards ended the contract in April 2000, demanding the return of its $52,502 deposit. Gillen denied that any modifications were done at J. Richards' request.
 {¶ 5} For its case, SMI called Stanley Tambor, Jr., SMI's president; Greg Wiciak, an SMI machinist; Christopher Mahoney, an SMI engineer; Greg Cutcher, an engineering expert who evaluated the machine; Mike Gaydos, a metal testing lab analyst; Stanley Tambor, Sr., the owner and former president of SMI; Lawrence Weber, the president of J. Richards; and Roger Starr, an engineering expert in evaluation of machinery performance and construction.
 {¶ 6} SMI presented evidence that J. Richards changed the machine's specs after accepting SMI's quote based on the initial requirements. Stanley Tambor Sr. testified that over 109 modifications were required, being caused by mistakes, suggestions, or the changes requested by J. Richards' engineers. SMI witnesses testified that J. Richards engineers were involved with the machine construction at the shop even after the "final delivery" date in December 1999. Expert testimony indicated that the rods sent from J. Richards were not consistent in form or length and that changes made by J. Richards, including the addition of the Cpk requirement[1] and the hopper/feeder, caused many modifications and increased costs to the original design. One expert opined that, despite the poorly made, inconsistent rods, SMI had produced a machine which met or exceeded all the required specifications, including the Cpk tolerance. Industry practice evidence was admitted that delivery deadlines are extended and additional costs are commonly incurred when modifications are made during the construction of a custom-built machine.
 {¶ 7} At the close of the case, J. Richards moved for a directed verdict on SMI's counterclaims, which the trial court denied. The jury found against J. Richards on its complaint and in favor of SMI, awarding $282,404.27 in damages.
 II. Assignments of Error {¶ 8} Both parties now appeal. J. Richards sets forth the following three assignments of error:
 {¶ 9} "1. The trial court erred by denying appellant's motion for directed verdict and a motion for judgment notwithstanding the verdict because it should have held that appellee breached the contract as a matter of law.
 {¶ 10} "2. The trial court erred by denying appellant's motion for summary judgment because it should have held that there is no genuine issue of material fact and that appellant was entitled to judgment as a matter of law on appellee's counterclaims.
 {¶ 11} "3. The trial court erred as a matter of law by entering judgment on the jury's damages award where damages are limited to the amount necessary to place the nonbreaching party in the same position in which it would have been had the other party performed."
 {¶ 12} SMI cross-appeals, arguing the following sole assignment of error:
 {¶ 13} "The trial court erred as a matter of law to the prejudice of cross-appellant's motion for pre-judgment interest by finding as a matter of law that it was not in the interest of justice to award cross-appellant pre-judgment interest on its money judgment for breach of contract.
 III. J. Richards' Appeal A. Motions for Directed Verdict and Judgment Notwithstandingthe Verdict
 {¶ 14} In the first assignment of error, J. Richards argues that the trial court erred in denying its motion for directed verdict and for judgment notwithstanding the verdict.
 {¶ 15} A motion for directed verdict is granted if, after construing the evidence most strongly in favor of the party against whom the motion is directed, "reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." Civ.R. 50(A)(4). Thus, while a motion for directed verdict requires the court to consider the evidence, such a motion presents only a question of law and requires the court to discern "whether there exists any evidence of substantive probative value that favors the position of the nonmoving party." Civ.R. 50(A)(4); Goodyear Tire RubberCo. v. Aetna Cas. Surety Co., 95 Ohio St.3d 512,2002-Ohio-2842, at ¶¶ 3-4; Ruta v. Breckenridge-Remy Co.
(1982), 69 Ohio St.2d 66, 69. On questions of law, an appellate court applies a de novo standard of review. Goodyear Tire Rubber Co., supra, citing to Cleveland Elec. Illum. Co. v. Pub.Util. Comm. (1996), 76 Ohio St.3d 521, 523.
 {¶ 16} The applicable standard of review to appellate challenges to the overruling of motions for judgment notwithstanding the verdict is identical to that applicable to motions for a directed verdict. Posin v. ABC Motor Court Hotel
(1976), 45 Ohio St.2d 271, 275. A motion for judgment notwithstanding the verdict should be denied if there is substantial evidence upon which reasonable minds could come to different conclusions on the essential elements of the claim. Id. at 275. "Conversely, the motion should be granted where the evidence is legally insufficient to support the verdict." Id.
 {¶ 17} In this case, the issues are: 1) whether the acts of the parties modified the contract for the construction and delivery of the drill and tap machine; and 2) whether J. Richards waived its right to reject the machine based upon an alleged breach of the completion deadline.
 {¶ 18} Later acts and agreements may modify the terms of a contract; unless otherwise specified, neither consideration nor a writing is necessary. Smaldino v. Larsick (1993),90 Ohio App.3d 691, 698; Software Clearing House, Inc. v. Intrak, Inc.
(1990), 66 Ohio App.3d 163, 172. Oral agreements to modify an earlier written agreement are binding if they are based upon new and separate legal consideration or, even if gratuitous, are so acted upon by the parties that a refusal to enforce the oral modifications would result in fraud to the promisee. SeeCitizens Fed. Bank v. Brickler (1996), 114 Ohio App.3d 401,407, citing to Thurston v. Ludwig (1856), 6 Ohio St. 1, 5. Where one party assents to any modification or change in the terms of the contract, the assent, either express or implied, if acted on by the other party, would be binding upon the first party. See O.F. Mehurin Son v. Stone (1881), 37 Ohio St. 49,57-58. Parties to a contract are also "bound toward one another by standards of good faith and fair-dealing." Bolling v.Clevepak Corp. (1984), 20 Ohio App.3d 113, 121.
 {¶ 19} Generally speaking, waiver is the voluntary relinquishment of a known right. State ex rel. Wallace v. StateMed. Bd. of Ohio (2000), 89 Ohio St.3d 431, 435; White Co. v.Canton Transp. Co. (1936), 131 Ohio St. 190, paragraph one of the syllabus. The waiver of contractual rights typically requires consideration unless the actions of the party making the waiver are such that he must be estopped from insisting upon the right claimed to have been relinquished. Marfield v. Cincinnati, D. T. Traction Co. (1924), 111 Ohio St. 139, 145. A waiver may be enforced by anyone having a duty to perform, but who has changed his or her position as a result of the waiver. Andrews v. StateTeachers Retirement Sys. Bd. (1980), 62 Ohio St.2d 202, 205, citing to White Co., supra.
 {¶ 20} The "waiver by estoppel" exists when the acts and conduct of a party are inconsistent with an intent to claim a right, and have been such as to mislead the other party to his prejudice and thereby estop the party having the right from insisting upon it. See Motz v. Root (1934), 53 Ohio App. 375,376-377. Equitable estoppel precludes a party from taking a contrary position, where the party, by his or her previous conduct, has induced another to change his or her position in good faith reliance upon that conduct. State ex rel. CitiesServ. Oil Co. v. Orteca (1980), 63 Ohio St.2d 295, 299. The obvious purpose of the doctrine is to prevent fraud and to promote the ends of justice. Ohio State Bd. of Pharmacy v.Frantz (1990), 51 Ohio St.3d 143, 145. A prima facie case for equitable estoppel requires proof of four elements: (1) a factual misrepresentation by one party; (2) that the misrepresentation was misleading; (3) that it induced actual reliance by the second party that was reasonable under the circumstances; and (4) that reliance upon the misrepresentation was detrimental to the second party. See Romine v. Ohio State Hwy. Patrol (2000),136 Ohio App.3d 650, 654.
 {¶ 21} Here, J. Richards contends that its case is simply a matter of contract interpretation and enforcement. It relies on the contract itself to demonstrate that SMI breached the agreement to build the drill and tap machine. J. Richards claims that the machine did not conform to contract specifications and was not delivered by the "final delivery letter" date of December 10, 1999. Concluding that SMI breached the contract, J. Richards claims that it was released from performance and was entitled to the return of its down payment. To the contrary, however, testimony was presented that other factors affected and modified the contract during the two years of construction, demonstrating a prima facie showing of waiver and waiver by estoppel. A review of the trial testimony is in order.
 {¶ 22} J. Richards' engineering manager, Garrett Gillen, testified that his company drew up specifications for the drilling and tapping machine and sent these to eight local machine building companies. Four bids were received, including one from SMI. SMI's initial quote of $73,000 for the machine was revised to $105,005 after several meetings between J. Richards' engineers and SMI's contact person, Del Drinkwater. The quoted amount of $105,005 was received as a bid by J. Richards on February 12, 1998 and a purchase order confirmed receipt and acceptance on February 23, 1998. Gillen testified about what he termed the "final version of the specs," which had signatures of Drinkwater, and John Brown, a J. Richards engineer. This document, otherwise identical to the original specifications, contained an added condition at the end of one of the paragraphs, that the machine conform to certain "Cpk" tolerances of "1.67." Gillen acknowledged that this addition was not in the original specifications; he claimed, however, that he had informed Drinkwater of the addition.
 {¶ 23} Gillen stated that the machine had problems during the construction which he acknowledged SMI tried to remedy. He denied that any modifications were made at J. Richards' request, and characterized them as design problems being worked out by SMI. Gillen confirmed that he, John Brown, and other J. Richards engineers had gone to the shop many times, but only to check on the construction progress.
 {¶ 24} Gillen testified that ultimately, in September 1999, J. Richards presented SMI with what he called a "final delivery date" letter and agreement. The agreement provided for an extension in delivery and some additional modifications to the machine. The machine was to be delivered by December 10, 1999, or SMI would return the down payment within thirty days of that date. The production rate for the machine was lowered to 600 pieces per hour, the range in size for parts was changed, and the Cpk value was lowered from 1.67 to 1.33. Gillen testified that J. Richards threatened to take legal action if SMI did not agree to these terms. The agreement was signed by Gillen and Stanley Tambor, Jr., then the president of SMI.
 {¶ 25} Gillen admitted that when the December delivery date came and passed, he had communications with Tambor Jr. and Tambor Sr. who said the machine was very close to completion. During this same time, J. Richards had contracted with SMI for two other projects, which were completed. On April 6 and May 6, 2000, SMI sent J. Richards invoices for those two projects. The next day, J. Richards' attorney sent a letter to SMI demanding the return of the deposit for the drilling machine. J. Richards then received an invoice for the machine dated April 12, 2000, showing charges for modifications, credit for the down payment and a balance due of $294, 368.40.
 {¶ 26} Gillen said that SMI had never mentioned that it was charging for any of the changes or modifications. He admitted that he never responded to a fax sent on June 30, 2000, from Tambor Jr. about coming to see the machine operate. When asked about the raw material quality, Gillen stated that the rods had never been tested for Cpk specifications, that they were not consistent in construction, and that the ultimate customer for whom the rods were being made did not require that they meet Cpk specifications. He also acknowledged that J. Richards had not paid for the two extra projects which were satisfactorily completed. Gillen agreed that, out of approximately 100 machines operating in J. Richards' plant, only two were designated as meeting Cpk tolerances.
 {¶ 27} Del Drinkwater, formerly employed as SMI plant manager, testified regarding the events leading up to the contract for building the drill and tap machine. He stated that he had received the original specs from December 1997 and passed them on to an engineer employee, Chris Mahoney, to determine a quote for the machine. He stated that, although he was not an engineer, he signed the original quote created by Mahoney, as well as the second one. Drinkwater stated that he did not notice the addition of the Cpk requirement, that no one ever discussed it with him, and that he did not even know what "Cpk" was.
 {¶ 28} Stanley Tambor, Jr., the final witness for J. Richards, called as if upon cross-examination, also was the first witness for SMI. Tambor, Jr., as president of SMI, handled sales and administrative duties. He stated that his father had a lifetime of experience and was the most talented machine builder he had ever met. He testified that he believed the machine had operated successfully and that J. Richards had refused delivery. Tambor, Jr. stated that he had signed the "final delivery" agreement because Gillen told him he "wasn't coming back without the signature or there would be a lawsuit pending." Tambor, Jr. signed because he did not want SMI to be sued. He testified that although the machine was not delivered on December 10, 1999, the engineers from J. Richards continued to come to the building for another three or four months. Tambor, Jr. said that after sending SMI the demand letter, J. Richards' attorney, Bruce Schoenberger, came out to the shop in early July, 2000 and saw the machine operate.
 {¶ 29} Stanley Tambor, Sr., age 78 at the time of trial, also testified for SMI at length about his work during the final eight months of the construction of the machine. Tambor Sr. explained the history of his engineering background, gained through his training and employment. He started SMI and built the business over the years, finally retiring in 1996. His son, Tambor, Jr. then became president and operated the company. When problems persisted with the machine designated for J. Richards, he himself returned to the shop to assist in the design and construction of the modifications. He testified that he often met weekly at the shop with J. Richards' personnel, including engineers John Brown, Garrett Gillen, and others.
 {¶ 30} Tambor, Sr. said that, from the outset, J. Richards began requesting changes and modifications, including the following: the addition of an automatic hopper/feeder assembly; changes to first accommodate one length of rods, then a longer size, and then to accommodate both sizes; changes due to mistakes made by Garrett or Brown in what was actually needed; changes due to inadequate coolants or air pressure needed to clear "chips" of steel generated when the machine was in operation; and modifications due to bent and unevenly cut rods provided by J. Richards.
 {¶ 31} Tambor, Sr. said the greatest reason for modifications, however, was J. Richards' addition of the Cpk standard. He testified that this requirement meant tearing the machine down, as well as many later modifications or adjustments, since the rods used did not conform to the same tolerance levels. In all, he had a list of more than 100 modifications resulting from J. Richards' requests or changes in specs. Tambor, Sr. stated that despite J. Richards' numerous requests and changes, his policy had always been to accommodate his customers. To that end, he persisted in finding solutions to the problems and ultimately created a machine that, in his opinion, did exactly what J. Richards desired.
 {¶ 32} Greg Cutcher, an engineering expert in testing machines, testified that he was hired by SMI to test the machine for performance and Cpk qualification. Cutcher explained that Cpk is "a statistical index * * * used to determine a machine's or process's ability to produce parts within a given tolerance range." Based upon data provided to him by SMI, he determined that the machine met the Cpk tolerance requirements and was performing as required under the contract. He informed SMI of these findings on June 26, 2000. Cutcher acknowledged on cross examination that he had not taken the measurements for the data provided to him and could not vouch for its accuracy.
 {¶ 33} Another expert, Mike Gaydos, testified that he had inspected and tested 10 steel rods from a sample of 75 taken from the rods provided to SMI by J. Richards for use in the drill and tap machine. He said he tested the rods' straightness and hardness.
 {¶ 34} A third expert, Roger Starr, testified that he was an engineer with expertise in evaluating the performance and specifications of machinery. Starr reviewed Cutcher's and Gaydos' test results and personally inspected the machine in late September and early October 2001. Starr testified that he and Tambor, Sr. spent hours talking about the features of the machine and taking certain measurements. Starr observed the machine while it was running and tested it to produce a sampling of approximately 60 finished rods. He testified that SMI had only about 100 rods with which to test the machine, preventing him from running a full five hour test. Starr stated, however, that based on a ten minute run, the machine produced 60 pieces, meeting J. Richards' requirement that it produce 600 rods per hour. Starr concluded that the machine also met the Cpk specification, even though J. Richards had provided for this run inferior raw material, that being steel rods, inconsistent in length and straightness. Starr stated that, in his experience, he had never seen a Cpk requirement for a piece of production machinery. He explained that Cpk is normally applied to an entire process, where extremely close and accurate tolerances are used on conforming raw materials with consistent qualities.
 {¶ 35} Starr also testified that most of J. Richards' modifications were made to add features not shown on the initial specifications. These included the automatic hopper/feeder, the large electrical box, and modifications to meet the Cpk requirement. Starr stated that when a machine needs modification or changes, any deadlines for completion are uncontrollable. He testified that, when constructing custom-made production machinery, it is industry practice for deadlines to be extended, especially when the customer requests modifications. Starr estimated the value of the machine to be actually $300,000-400,000. He also itemized the cost of each addition or modification.
 {¶ 36} On cross-examination, Starr acknowledged that he had not seen the machine running in December 1999 or in June 2000. He also agreed that the machine had run close to five hours without work pieces, but because of the limited quantity of rods, had not run five hours with work pieces. Starr further admitted that on the day of the test run, he did not do additional testing because of an "electronic glitch" in the machine. Starr's final opinion, however, was that the machine met or exceeded the contract specifications and was completely operational.
 {¶ 37} The record shows that, while evidence was presented that SMI may have breached the contract in missing the delivery date, there was also evidence that J. Richards allegedly caused the breach and consented to the delays. Thus, as a matter of law, there was sufficient evidence from which reasonable minds could differ on: the terms of any oral agreements or modifications between the parties; whether J. Richards' actions prevented SMI from performing the work on schedule; whether J. Richards' actions constituted a waiver of any contract terms; and whether SMI substantially performed its obligations under the contract.
 {¶ 38} Since substantive evidence was presented which favored SMI, the non-moving party, we conclude that the trial court did not err in denying J. Richards' motions for directed verdict or judgment notwithstanding the verdict. Accordingly, J. Richards' first assignment of error is not well-taken.
 Motion for Summary Judgment on Counterclaims {¶ 39} In the second assignment of error, J. Richards claims that the trial court erred in denying its motion for summary judgment on SMI's counterclaims. SMI's counterclaims included three claims for "breach of agreement" and one claim for quantum meruit/unjust enrichment. Since SMI withdrew the quantum meruit/unjust enrichment claim at trial, we will address only the breach of contract claims.
 {¶ 40} The standard of review of a grant or denial of summary judgment is the same for both a trial court and an appellate court. Lorain Natl. Bank v. Saratoga Apts. (1989),61 Ohio App.3d 127, 129. Summary judgment will be granted if "the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of facts, if any, * * * show that there is no genuine issue as to any material fact" and, that, construing the evidence most strongly in favor of the non-moving party, "reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law." Civ.R. 56(C). An appellate court reviews summary judgments de novo and without deference to the trial court's determination. Brown v. CountyCommrs. (1993), 87 Ohio App.3d 704, 711; Coventry Twp. v.Ecker (1995), 101 Ohio App.3d 38, 42.
 {¶ 41} The burden of proof is upon the party moving for summary judgment to establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. AAAA Enterprises, Inc. v. River Place Community UrbanRedevelopment Corp. (1990), 50 Ohio St.3d 157, paragraph two of the syllabus; Civ.R. 56(C). All evidence submitted in connection with a motion for summary judgment must be construed most strongly in favor of the party against whom the motion is made.Morris v. First Natl. Bank Trust Co. (1970),21 Ohio St.2d 25, 28. In reviewing a trial court's grant of summary judgment, an appellate court must view the facts in a light most favorable to the party who opposed the motion. Osborne v. Lyles (1992),63 Ohio St.3d 326, 327.
 {¶ 42} J. Richards argued that the only evidence relevant to SMI's counterclaims were the original specifications and the later "Final Delivery Letter." It is well established that written contracts may be modified either explicitly or implicitly. See Mehurin Son v. Stone (1881), 37 Ohio St. 49,57-58. Additionally, a verbal agreement may act as a waiver or modification of prior written contract between the parties if the agreement has been so far executed or acted upon by the parties that a refusal to carry it out would operate as a fraud upon one of the parties. Thurston v. Ludwig (1856), 6 Ohio St. 1, syllabus.
 {¶ 43} In this case, the deposition testimony and evidence before the trial court on summary judgment comports with the testimony and evidence presented at trial. Therefore, for the same reasons stated in the discussion of the first assignment of error, since issues of material facts remained in dispute and J. Richards was not entitled to judgment as a matter of law, the trial court properly denied J. Richards' motion for summary judgment as to SMI's counterclaim for damages arising out of the parties' modified contract. Accordingly, the second assignment of error is not well-taken.
 Damages Awarded {¶ 44} J. Richards, in its third assignment of error, contends that any damages arising out of the contract should be limited to the original contract price of $105, 005.
 {¶ 45} Contracts are the mutual exchange of promises, with each party holding an expectation of certain obligations and benefits. Where a construction contract specifically provides that "additional, altered, or extra work must be ordered in writing, the stipulation is valid and binding upon the parties, and no recovery can be had for such work without a written directive therefor [sic] in compliance with all terms of the contract, unless waived by the owner or employer." FosterWheeler Enviresponse, Inc. v. Franklin Cty. Convention FacilitiesAuth. (1997), 78 Ohio St.3d 353, 360. Where no such clause exists, additional contract terms may "supersede the original terms to the extent the two are contradictory. If the additional terms are ambiguous, then we are to give effect to the additional terms but we are to interpret them consistently with the original terms to the extent possible." Ottery v. Bland (1987),42 Ohio App.3d 85, 87. As noted previously, the parties' conduct may show that a modification and waiver of contract terms, including price, has occurred, when one party acts to its detriment in reliance upon the actions and acquiescence of the other party.State ex rel. Cities Serv. Oil Co. v. Orteca (1980),63 Ohio St.2d 295, 299.
 {¶ 46} We also note that when a contract is repudiated at a time when the injured party has not yet performed, ordinarily a savings to the injured party occurs by reason of not having to perform its promise. F. Enterprises, Inc. v. Kentucky FriedChicken Corp. (1976), 47 Ohio St.2d 154, 159. This savings is deducted from the compensation under the contract the injured party would have received from the breaching party if the contract had been fully performed. Id. An injured party is only entitled to a damage award placing it in as good a position as it would have had if the contract were fully performed. Id., citing to Allen, Heaton McDonald, Inc., v. Castle Farm Amusement Co.
(1949), 151 Ohio St. 522, paragraph one of the syllabus; Restatement of Contracts 533, Section 335. Contract law acknowledges that mitigation, otherwise known as the doctrine of avoidable consequences, may justly place an injured party "in as good a position had the contract not been breached at the least cost to the defaulting party." Frenchtown Square Partnership v.Lemstone, Inc., 99 Ohio St.3d 254, 2003-Ohio-3648 at ¶ 12.
 {¶ 47} In this case, J. Richards claims that SMI was entitled to not more than $105,005 as provided in the initial contract quote. This rationale, however, ignores the contract modifications, which added to the cost of the drill and tap machine. When J. Richards opted to back out of the contract after earlier acquiescing to extended completion deadlines, SMI relied on these actions to its ultimate detriment. Even considering the duty to mitigate damages, SMI had substantially completed a machine uniquely created for J. Richards' business at the time J. Richards attempted rescission. Testimony was presented that no secondary market exists for such a machine and, thus, no possibility of recoupment of SMI's costs in a sale to another buyer. SMI is entitled to its costs for modifications, as this would place it in the same position if J. Richards had fully performed under the contract. The award conforms to SMI's invoice submitted and the trial court did not err in entering judgment on the jury's verdict. The third assignment of error is not well-taken.
 SMI's Cross-appeal {¶ 48} SMI argues that the trial court erred in denying its request for pre-judgment interest.
 {¶ 49} The award of prejudgment interest as to claims arising out of breach of contract is governed by R.C. 1343.03(A).Galmish v. Cicchini, 90 Ohio St.3d 22, 33. R.C. 1343.03(A) states, in pertinent part, that "when money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate of ten per cent per annum * * *."
 {¶ 50} Under R.C. 1343.03(A), the trial court does not have discretion in awarding prejudgment interest. Slack v. Cropper
(2001), 143 Ohio App.3d 74, 85. Therefore, while the factual determination as to when the interest is to accrue may be discretionary, the award of the interest is not. See Dwyer Elec.v. Confederated Builders (Oct. 29, 1998), Crawford App. No. 3-98-18. In determining whether to award prejudgment interest pursuant to R.C. 1343.03(A), a court must consider whether the aggrieved party been fully compensated. Royal Elec. Constr.Corp. v. Ohio State Univ. (1995), 73 Ohio St.3d 110, 116. "In order to make the aggrieved party whole, the party is compensated `for the period of time between accrual of the claim and judgment, regardless of whether the judgment is based on a claim which was liquidated or unliquidated and even if the sum due was not capable of ascertainment until determined by the court.'" (Emphasis sic.) Mayer v. Medancic (Dec. 21, 2001), Geauga App. Nos. 2000-G-2311, 2000-G-2312, and 2000-G-2313, citing Royal Elec. Constr. Corp., supra, at paragraph one of the syllabus.
 {¶ 51} Money that is directly due and payable under a contract is the type of claim upon which interest is allowed under R.C. 1343.03(A). Masiongale Electrical-Mechanical, Inc. v.Constr. One, Inc., 10th Dist. No. 02AP-138, 2002-Ohio-4736 at ¶ 42.
 {¶ 52} In this case, the trial court denied SMI's request for prejudgment interest entirely. This was error, for the claims and damages awarded in the judgment arose out of the contracts and modifications between J. Richards and SMI for constructing the drill machine and two other projects. Since J. Richards did not pay any of the invoices, SMI was deprived of those funds while the parties litigated certain issues, and, under R.C. 1343.03(A), it is entitled to receive prejudgment interest. The only determination to be made is when the interest begins to accrue. This case must, therefore, be remanded for the trial court to determine the dates of accrual of interest as provided under R.C.1343.03(A) for the three projects.
 {¶ 53} As the trial court erred in denying SMI prejudgment interest for the three orders, SMI's sole cross-assignment of error is well-taken.
 {¶ 54} The judgment of the Lucas County Court of Common Pleas is affirmed in part, and reversed in part. Court costs of this appeal are assessed to appellant.
Judgment Affirmed in part and Reversed in part.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, P.J., Knepper, J., Lanzinger, J., concur.
[1] "Cpk" indicates the tolerances in measurements that a machine or process must stay within when manufacturing parts.